FILED

U.S. Bankruptcy Appellate Panel
of the Tenth Circuit

**March 7, 2016**

**Blaine F. Bates**
**Clerk**

PUBLISH

# UNITED STATES BANKRUPTCY APPELLATE PANEL

# OF THE TENTH CIRCUIT

| | |
|---|---|
| IN RE ROBERT M. LANE, also known as Bob Lane, | BAP No. WY-15-023 |
| Debtor. | |
| ROBERT M. LANE, | Bankr. No. 11-20398 |
| Appellant, | Chapter 7 |
| v. | OPINION |
| GARY A. BARNEY, Chapter 7 Trustee, | |
| Appellee. | |

Appeal from the United States Bankruptcy Court
for the District of Wyoming

Robert M. Lane, pro se Appellant.

John C. Smiley, (Theodore J. Hartl with him on the brief) of Lindquist & Vennum LLP, Denver, Colorado, for Appellee.

Before **KARLIN**, Chief Judge, **CORNISH**, and **MICHAEL**, Bankruptcy Judges.

**KARLIN**, Chief Judge.

Robert Lane appeals an order of the bankruptcy court imposing monetary sanctions against him for interfering with the sale of estate assets. The order required that the sanctions be deducted from the money that would otherwise be available to distribute to Lane after payment of all claims and completion of final administration of his bankruptcy estate. The issue is whether the bankruptcy court

abused its discretion in imposing sanctions, notwithstanding Lane's main argument that he does not have the present ability to pay those sanctions.

## I.    Background

When Robert Lane filed his Chapter 7 bankruptcy petition in April 2011, his statements and schedules disclosed no nonexempt assets for the Trustee to administer. Over the next (almost) five years, following a tip received from Lane's former wife detailing significant undisclosed assets, the Trustee uncovered millions of dollars of assets including numerous pieces of art, valuable coins, and two multi-million dollar homes located in California and Wyoming. Lane now admits it is a "40+ million bankruptcy estate."[1]

The Trustee filed multiple adversary proceedings against Lane, his family members, and family-controlled entities, seeking to revoke Lane's discharge and to recover assets for the benefit of the estate. In April 2013, the Trustee reached two settlements (collectively, the "Settlement Agreements"). One was with Lane and the other with several close family members. The Settlement Agreements allowed Lane to retain significant assets, including retirement accounts in an amount up to $2.5 million; continued use of both homes until the Trustee could sell them; and retention of some artwork, valuable coins, furnishings, and three automobiles.

One term of the Settlement Agreement with Lane that was especially valuable to the Trustee was a requirement that Lane stand down and stop interfering with the further administration of the estate. The purpose of this provision was to allow the Trustee to more expeditiously liquidate significant

---

[1]    Appellant's [sic] Opposition to Trustee's Bill of Costs at 2, *in* Appellee's Appendix (the "Supp. App.") at 954. In this pleading, which Lane filed in his bankruptcy case (not in one of his appeals), Lane incorrectly refers to himself as the "appellant" instead of as the "debtor."

assets and pay creditors without further litigation and interference from Lane.[2]

That "no interference" promise came in the form of a paragraph where Lane

expressly waived standing in his bankruptcy and further agreed to "not take any

action, directly or indirectly, to obtain standing . . . ."[3] Lane also agreed that he

would

> not have any standing to object, join, or otherwise be heard on any matter or proceeding in any pending or future matter in connection with administering Debtor's Bankruptcy Case; this shall include, but not be limited to, approval of settlements, sale of assets, allowance or payment of administrative expenses, and allowance or payment of claims.[4]

But Lane did not stand down. Instead, Lane filed numerous pro se

pleadings (to which the Trustee had an obligation to respond), including a

pleading essentially objecting to the Trustee's compromise of a creditor's claim,

objecting to the sale of estate property, objecting to the Trustee's fees, objecting

to the sale of art, and objecting to relief regarding the sale of assets located in

---

[2]     As this Court previously stated in another decision emanating from this bankruptcy, "Lane's waiver of standing to object was valuable to the Trustee and the estate, as Lane has filed numerous objections and other pleadings that have apparently slowed down asset sales and increased administrative costs for the estate. *See, e.g.*, docket for Case No. 11-20398 ("Docket"), Lane's supplemental appendix ("Lane App. 2") at PDF pp. 23 (Docket No. 981—Opposition to Trustee's Motion to Sell Estate's Interest in Bullion Coins Free and Clear); 33 (Docket No. 889—Objection to Application for Writ of Execution for Possession of Real Property); 46 (No. 778—Objection to Trustee's Motion to Sell Wilson, Wyoming Property Free and Clear); 60 (Docket No. 650—Opposition to Trustee's Motion to Turnover Post-Petition Insurance Proceeds on Debtor's Post-Petition State Farm Insurance Coverages); 68 (Docket No. 589—Opposition to Proposed Sale of Art); 112 (Docket No. 229—Opposition to Proposed [Family] Settlement)."*In re Lane*, Nos. WY–14–053, WY–14–054, 2015 WL 1285976, at *1 n.5 (10th Cir. BAP Mar. 20, 2015).

[3]     Order Approving Settlement Agreement Between the Trustee and the Debtor (the "Settlement Order") at 9, *in* Appellant's Appendix ("Appellant's App.") at 70.

[4]     *Id*. at 9-10, *in* Appellant's App. at 70-71.

California.[5] In addition, Lane proceeded to file seventeen appeals from orders of the bankruptcy court, and then nine appeals to the Tenth Circuit Court of Appeals—all of which the Trustee was required to defend.[6] This is one of those appeals, and it centers around just two of his efforts to interfere with the smooth administration of his estate.

To give context to this dispute, it is important to note that on April 4, 2014, the Trustee, understandably fatigued with Lane's attempts to interfere with the estate's administration, filed his first motion for contempt (the "First Contempt Motion"). He alleged that the estate had suffered $16,897 in fees and costs as a result of the breach of Lane's promise, contained in the Settlement

---

[5]     Opinion on Trustee's Motion for Contempt Sanctions Against Robert M. Lane (the "First Contempt Decision") at 4, *in* Supp. App. at 344. The bankruptcy court cited these additional pleadings Lane filed that "violated the order approving the Debtor Settlement Agreement:" (1) Status Report on Proposed Settlement Agreement Between Trustee Gary Barney and Dr. Galo Tan and Request to Reject Settlement (Dkt. #391); (2) Opposition to Proposed Sale of Coins (Dkt. # 409); (3) Debtor's Objection to Trustee's Counsel's Excessive Fee Request (Dkt. # 479); (4) Debtor's Opposition to Trustee's Motion to Strike Debtor's Opposition to Proposed Sale of Art (Dkt. # 655); and (5) Debtor's Response to Trustee's Motion for Turnover of California Assets (Dkt # 601).

[6]     BAP Cases 11-99 (filed 10/2011); 14-7 (filed 02/2014); 14-30 (filed 07/2014); 14-36 (filed 07/2014); 14-39 (filed 07/2014); 14-53 (10/2014); 14-54 (filed 10/2014); 14-61 (filed 11/2014); 15-7 (filed 01/2015); 15-9 (filed 2/2015); 15-23 (filed 06/2015); 15-49 (filed 11/2015); 15-50 (filed 11/2015); 15-51 (filed 11/2015); 15-52 (filed 11/2015); 15-53 (filed 11/2015); and Wyoming District Court Case No. 15-114 (filed 07/2015). Lane filed all these appeals *pro se* except for three. The two attorneys who brought those three appeals withdrew from representing Lane at the early stages of those appeals. Although final orders have not been issued in all appeals, to date, the vast majority have been dismissed or relief denied to Lane. The one exception is *In re Lane*, Nos. WY–14–053, WY–14–054, 2015 WL 1285976 (10th Cir. BAP Mar. 20, 2015), in which this Court remanded to eliminate $3,013 of the $26,139 in fees and costs the bankruptcy court had allowed the Trustee when he was required to enforce a writ of execution to evict Lane from the two homes he had been allowed to use pending their sale.

Agreement.[7] The Trustee requested the bankruptcy court award $12,000 as an "appropriate sanction[ ]."[8] Lane defended by saying he did not have $12,000.

The bankruptcy court nevertheless, after a hearing, entered its First Contempt Decision listing six separate acts that justified the finding of contempt and the finding that the Trustee had been harmed as a result of Lane's violation of the Settlement Order. The bankruptcy court noted that the Trustee and his counsel had been required to address Lane's "numerous pleadings rather than pursue assets of the estate" and that the estate had, as a result, incurred unnecessary expenses.[9] The bankruptcy court awarded a $12,000 money judgment against Lane. "Taking [Lane's] financial condition into consideration,"[10] the bankruptcy court further ordered the sanctions be deducted from any surplus distribution that might be payable to Lane at the conclusion of estate administration or from further undisclosed assets the Trustee might find, rather than ordering Lane to immediately pay.

The bankruptcy court found "incredulous" Lane's testimony that he was not intentionally being obstructive and was only trying to "help."[11] The bankruptcy court then ordered filing restrictions be placed on Lane similar to those that had been placed on him by the United States District Court for the District of Wyoming[12] (in an order dismissing one of his numerous appeals). Lane

---

[7]    Settlement Order, Exhibit 1, *in* Appellant's App. at 72.

[8]    First Contempt Motion at 6, *in* Supp. App. at 110.

[9]    First Contempt Decision at 4, *in* Supp. App. at 344.

[10]    *Id.* at 5, *in* Appellant's App. at 345.

[11]    *Id.* at 6, *in* Appellant's App. at 346.

[12]    Order Granting Motions to Dismiss of Gary A. Barney, As Chapter 7 Trustee and Vikki Lane at 3, *in* Supp. App. at 357 (stating that Lane had waived
                                                                                        (continued...)

did not appeal the First Contempt Decision.

Although the Trustee had filed his First Contempt Motion in early April, 2014, thus officially putting Lane on notice that similar actions in violation of the Settlement Agreement could result in sanctions against him, this did not stop Lane. On April 11, 2014, following an evidentiary hearing, the bankruptcy court entered an order (the "Art Sale Order") authorizing the sale of artwork ("the Estate Art") that had not been set over to Lane in the Settlement Agreements. The Art Sale Order specifically noted the Estate Art would be sold free and clear of liens, and the court had previously authorized the employment of Heather James Fine Art ("Heather James") to effectuate the sale.[13] As Heather James was attempting to market the Estate Art, in May 2015, Lane emailed Heather James stating, "If you cho[o]se to sell any of this art between now and the Court's ruling (for which a has not yet been determined), you may be required to purchase it back . . . . I do not think this would be advisable."[14]

After receiving this email, representatives of Heather James contacted the Trustee and expressed concern about the legal ramifications if they continued to market and sell the Estate Art. After consulting with the Trustee and confirming that the bankruptcy court had, in fact, approved the sale of the Estate Art, Heather James continued its work. Lane then sent Heather James a second email. This time he indicated that the Estate Art was subject to numerous liens and

---

[12]    (...continued)
standing to contest the bankruptcy court order he appealed, noting that Lane "has a history of abusive and frivolous filings with the Bankruptcy Court and the District Court, as well as various state courts," recounting some of Lane's "prolonged history of abusing the judicial process," and incorporating discussions of "Lane's abusive history of vexatious and frivolous litigation" from other litigation).

[13]    Art Sale Order at 3, *in* Supp. App. at 196.

[14]    Trustee's Second Contempt Motion, Exhibit E, at 2, *in* Supp. App. at 211.

falsely stated that the Art Sale Order did not permit the sale free and clear of liens. He also suggested that the sale would create "unnecessary liability for your firm or yourself personally."[15]

Lane's interference with the Trustee's attempts to sell estate assets did not end there. In July 2014, the bankruptcy court entered its order authorizing the sale of the California property for $6.9 million. Before the sale closed, Lane filed a notice of lis pendens in the California real estate records. As a result of the notice, the purchaser refused to close. Ultimately, following further negotiations and a loss of several months, the purchaser closed on the sale but at a purchase price of $6.5 million, or $400,000 less than the original purchase price.

Immediately upon learning of the second of the two emails in late May 2014, the Trustee filed his second motion for contempt seeking monetary sanctions in an amount to be determined after the Trustee provided an accounting of fees and costs incurred. After hearing evidence, the bankruptcy court found that Lane had interfered both with the sale of the Estate Art by sending the May 2015 email to Heather James and with the sale of the California property by recording the lis pendens.

As a result of its findings that Lane had violated the Lane Settlement Agreement, the Art Sale Order, and his duties as a debtor under 11 U.S.C. § 521, the bankruptcy court held that monetary sanctions were necessary (the "Second Contempt Decision"). The bankruptcy court stated that Lane "displays a complete disregard for the Bankruptcy Code and procedures. The court finds his actions to be in bad faith, reckless, abusive and grossly disobedient."[16] It also noted that

---

[15]    Trustee's Exhibit 7 at 2, *in* Supp. App. at 271.

[16]    Second Contempt Decision at 7, *in* Appellant's App. at 255.

Lane's email to Heather James reflected "a pattern of intimidation."[17] The bankruptcy court directed the Trustee to submit a Bill of Costs.

The Trustee's Bill of Costs requested $455,125 in attorneys' fees plus $400,000 in additional damages (the "Sale Reduction Damages") based on the alleged diminution in value of the California property that resulted after Lane filed the lis pendens notice. After Lane objected to the Bill of Costs, the bankruptcy court conducted another evidentiary hearing (the "Sanctions Hearing") to determine the appropriate amount of sanctions.[18]

During the trial, the court inquired whether the attorneys' fees sought as a sanction would ultimately become part of the administrative claims, thus possibly reducing the recovery of Lane's prepetition unsecured creditors, or whether the Trustee was asking for Lane to pay it, personally. The Trustee's counsel agreed that the sanctions would be payable only from any surplus funds that Lane might be entitled to receive, after payment of all claims, and not from assets of the estate needed to pay other claims.[19]

At trial, Lane's main defense to the award of sanctions was that he was

---

[17] *Id*. at 6, *in* Appellant's App. at 254.

[18] During opening arguments at the Sanctions Hearing, the Trustee's counsel specifically requested a judgment in favor of the estate for the Sale Reduction Damages but asked for a judgment in favor of Lindquist & Vennum (the law firm retained by the Trustee) for the requested attorneys' fees. It appears Lindquist & Vennum sought a judgment in its favor (rather than in the estate's favor) both because its fees were capped by agreement and because sanctions paid to the estate would create no deterrence against further sanctionable conduct. For example, if the surplus was $400,000 and Lane was required to repay the estate $321,659 from that sum, he would receive $78,341 of the surplus funds. Lane's $321,659 payment to the estate would then create a new surplus, since by definition all claims would have already been paid in order for a surplus to exist. He would then be entitled to the newly created surplus he had just paid to the estate.

[19] Tr. at 51, *in* Appellant's App. at 702.

unable to pay any amount. He argued that any award would, therefore, be improper. He also claimed that because he was "sorry"[20] his actions had caused damages and because he is not an attorney, no sanctions should be awarded.

The bankruptcy court awarded the requested sanctions for attorneys' fees, but reduced the amount to $321,659. The bankruptcy court denied approximately $133,466 in fees it determined that the Trustee had either failed to prove were directly attributable to Lane's contemptible conduct, or that were not adequately described in the Bill of Costs. The bankruptcy court also denied the Trustee's request for the Sale Reduction Damages, finding that the Trustee failed to meet his burden to prove that Lane's actions (in filing the lis pendens notice) caused the reduction in the sale price of the California property.

Although the order awarding sanctions (the "Second Sanctions Decision") did not make specific findings regarding Lane's ability to pay, it expressly noted that Lane had "argued monetary sanctions may not be entered against him due to his lack of income."[21] In addition, the bankruptcy court had, just six months earlier in its First Contempt Decision, discussed Lane's financial circumstances.

The Second Sanctions Decision stated that, despite Lane's alleged inability to pay, his "behavior is not without ramifications and the Court finds the sanctions appropriate."[22] It then prohibited the Trustee from collecting the sanctions from Lane personally, without further order of the court—just as it had done earlier for the $12,000 sanctions award. It instead again ordered that the sanctions could be deducted from any surplus ultimately available to Lane at the conclusion of the administration of his estate or from any further undisclosed

---

[20]     Appellant's Br. at 38.

[21]     Second Sanctions Decision at 4, *in* Appellant's App. at 940.

[22]     *Id*.

-9-

assets that might be recovered.[23]

## II.  Standard of Review

We review a bankruptcy court's decision to issue monetary sanctions under an abuse of discretion standard.[24]

## III.  Discussion

### A.  The bankruptcy court did not abuse its discretion in ordering sanctions against Lane notwithstanding his claim he has no present ability to pay them.

Lane argues that the bankruptcy court abused its discretion in ordering sanctions because it failed to consider his ability to pay and failed to make express findings on that issue.[25] The Trustee counters that the bankruptcy court admitted—and obviously considered—the evidence of Lane's alleged inability to pay, as it ultimately declined to require Lane to pay the sanctions forthwith but

---

[23]     Neither the Second Sanctions Decision nor the Amended Judgment on Trustee's Bill of Costs mentions Lindquist & Vennum's request for a separate judgment in its favor. Instead, judgment is simply granted on the "Trustee's request for monetary sanctions against Debtor [ ] in the amount of $321,659." Amended Judgment on Trustee's Bill of Costs at 1, *in* Appellant's App. at 941.

[24]     *In re Nursery Land Dev., Inc.*, 91 F.3d 1414, 1415 (10th Cir. 1996) (bankruptcy court's decision to impose sanctions reviewed for abuse of discretion).

[25]     Lane also raises on appeal that the Second Sanctions Decision was erroneous because it conflicted with an order issued by a Wyoming state court that had recently found him insolvent in a matter involving child support. The record indicates that the bankruptcy court did admit into evidence and consider the state court's order finding him insolvent. The bankruptcy court was obviously not bound by the insolvency finding because the issues were not identical in the two cases, and more importantly, the Trustee was not a party to the state court litigation. *Sierra Club v. Two Elk Generation Partners, Ltd. P'ship*, 646 F.3d 1258, 1265 (10th Cir. 2011) (collateral estoppel applies to preclude litigation of factual issues only if (1) the same issues were necessary to a prior final judgment on the merits, and (2) the party against whom estoppel is sought was a party to the prior proceeding and had a full and fair opportunity to litigate).

instead only required they be paid from any estate surplus or newly discovered assets.

In support of his position, Lane relies almost entirely on case law addressing sanctions imposed under Federal Rule of Civil Procedure 11 ("Rule 11"). Case law interpreting Rule 11 provides that courts *must* consider (1) the opposing party's reasonable expenses incurred as a result of the violation, including reasonable attorneys' fees; (2) the minimum amount necessary to adequately deter future misconduct; (3) and "[t]he offender's ability to pay . . . ."[26]  At the time the bankruptcy court issued the Second Sanctions Decision, however, the Tenth Circuit had declined to apply the Rule 11 requirements to other available sanctions specifically authorized by rule or statute, or sanctions that a court may impose inherent to its authority.[27] Approximately one month after the Second Sanctions Decision was issued, however, the Tenth Circuit decided *Farmer v. Banco Popular of North America*.[28] For the first time, the Tenth Circuit applied the Rule 11 factors set forth in *White*

---

[26]     *White v. Gen. Motors Corp.*, 908 F.2d 675, 685 (10th Cir. 1990). Although the bankruptcy court did not specify under which rule or by what authority it was assessing sanctions in the Sanctions Decision, we note the decision quickly followed the First Contempt Decision, which clearly indicated the sanction was based on the court's inherent power to hold a party in civil contempt and to award sanctions under 11 U.S.C. § 105(a). In addition, the record demonstrates that the sanctions clearly were neither requested nor assessed pursuant to Rule 11.

[27]     *See Hamilton v. Boise Cascade Express*, 519 F.3d 1197, 1205 (10th Cir. 2008) (noting that precedents concerning Rule 11 would not be applied to the context of sanction awards under 28 U.S.C. § 1927); *Hutchison v. Pfeil*, 208 F.3d 1180, 1186 (10th Cir. 2000) (recognizing that sanctions under the court's inherent powers and the court's authority under 28 U.S.C. § 1927 are not governed by the same standards as Rule 11).

[28]     791 F.3d 1246, 1259 (10th Cir. 2015).

*v. Gen. Motors Corp.*[29] to an award of sanctions made under 28 U.S.C. § 1927 or the court's inherent powers. The Tenth Circuit specifically held that, as in *White*,

> [f]irst, the amount of fees and costs awarded must be reasonable. Second, the award must be the minimum amount reasonably necessary to deter the undesirable behavior. And third, because the principal purpose of punitive sanctions is deterrence, the offender's ability to pay *must* be considered. Depending on the circumstances, the court may consider other factors as well, including the extent to which bad faith, if any, contributed to the abusive conduct.[30]

Under *Farmer*, courts must now consider ability to pay when considering sanctions under 28 U.S.C. § 1927 or the court's inherent powers.[31]

The record here indicates the bankruptcy court did properly admit and consider evidence offered by Lane regarding his ability to pay. The Trustee also introduced evidence suggesting that Lane might well have the ability to pay.[32]

---

[29]     *White v. Gen. Motors Corp.*, 908 F.2d 675, 684-85.

[30]     *Farmer*, 791 F.3d at 1259 (citations omitted) (emphasis added).

[31]     If the person against whom sanctions is sought will not have to pay the sanctions until assets sufficient to pay them become available to him, as is the case here, he obviously does (or will) have the ability to pay. As a result, the court's obligation to consider the availability of other assets is lessened or eliminated.

[32]     For example, the bankruptcy court was well aware that Lane had been allowed to retain assets valued in excess of $2.5 million as a result of the Settlement Agreements, which assets included "assets in Lane's IRA and Penobscot Pension Plan in an amount not to exceed $2.5 million," certain "collectibles" including books, wine, baseball memorabilia, numismatic coins, a collection of fountain pens, and some art, three automobiles, and furnishings located in his two multi-million dollar homes. Settlement Order at 4-5, *in* Supp. App. at 36-37; Opinion on Debtor's Motion to Compel Trustee to Comply with Terms of Settlement at 2-9, *in* Supp. App. at 279-86 (referencing gold and silver coins held as pension assets, exchanged postpetition by Lane's pension for artwork valued at $470,700 and finding that "Debtor failed to properly disclose the value of his Pension Assets upon filing his bankruptcy petition and schedules . . . .") *Id.* at 8, *in* Supp. App. at 285. In addition, the record before the bankruptcy

(continued...)

Although the bankruptcy court did not make a specific factual finding regarding Lane's ability to pay, the bankruptcy court did state that it had "carefully considered the applicable pleadings, evidence and legal arguments presented" before concluding that sanctions were appropriate notwithstanding Lane's defense he lacked regular income. In addition—and perhaps the most telling proof that the bankruptcy court considered Lane's poverty defense—is that the court specifically prohibited the Trustee from any attempts to collect the sanctions from Lane personally, unless it sought and received further order of the court, and directed that the sanctions be paid only from any surplus distribution or any additional undisclosed assets recovered by the Trustee.

Finally, consideration of ability to pay is just one factor that a bankruptcy court must consider in imposing sanctions. The other factors, including the history of the parties and the severity of the sanctionable conduct, all support the bankruptcy court's decision to impose sanctions. As a result, we hold that the bankruptcy court did not abuse its discretion in imposing sanctions against Lane, and in deferring collection of those sanctions until surplus estate assets are available to pay them.

**B.** **The bankruptcy court did not abuse its discretion in ordering that the sanctions could be paid from any estate surplus or newly found assets.**

Lane next argues that the bankruptcy court abused its discretion in awarding sanctions because he claims the bankruptcy court "deceived him" when

---

[32] (...continued)
court demonstrated that when Lane wants to buy something, he seems to be able to raise the money to do so, notwithstanding his claimed impoverished state. For example, in April 2014, Lane sought to purchase over thirty separate pieces of art worth $540,740 from the estate, apparently from his retirement funds. Trustee's Second Contempt Motion, Exhibit B *in* Supp. App. at 199-201.

it elected to order those sanctions be paid from any surplus assets.[33] He apparently believes the court was required to warn him this was a possibility so he could more clearly address it. Substantively, Lane's argument seems to be that the surplus distribution, if there is one, would be derived from "prepetition" assets, and that the court cannot satisfy a sanctions award entered against him after the petition was filed from those assets.

As a preliminary matter, Lane appears not to have been deceived at all; in fact, he made the identical argument in his initial pleading opposing the Bill of Costs—months before the conversation he had with the judge who he now contends deceived him.[34] Second, case law supports the proposition that a postpetition creditor is entitled to execute against any surplus from the estate of its debtor to pay its postpetition claim.[35] Accordingly, the bankruptcy court did

---

[33]     Appellant's Br. at 31. Lane alternatively argues that because there may not be surplus funds, the bankruptcy court was not authorized to order the sanctions paid from those surplus funds if any exist. At oral argument, the Trustee admitted that it was more likely than not that there would be money in the estate after payment of all claims (assuming Lane stops efforts to impede administration), and as a result, that Lane may well be entitled to receive surplus assets. The Trustee also committed the estate to never seeking relief against Lane, personally, if it turns out there are no surplus assets.

[34]     Appellant's [sic] Opposition to Trustee's Bill of Costs, at 9, *in* Supp. App. at 961 (Lane argues "no legal authority has been cited for permitting post-petition sanctions to be paid out of the pre-petition bankruptcy estate.") He cited no authority then, and continues to cite no authority for this position.

[35]     *See In re Rocky Mountain Refractories*, 208 B.R. 709, 714 (10th Cir. BAP 1997) (if debtor ultimately proves solvent, creditors may receive any surplus, specifically claims for interest arising postpetition, ahead of payment to debtor); *In re Yan*, No. 04–33526 TEC, 2010 WL 4791839, at \*3 (Bankr. N.D. Cal. Nov. 18, 2010) *aff'd In re Yan*, Nos. NC–10–1476–JuHPa, 2011 WL 2923855, at \*7 (9th Cir. BAP July 11, 2011) (finding that two postpetition creditors who had obtained writs of attachment against the estate could collect against a debtor's surplus estate assets); *cf. Flanders v. Lawrence (In re Flanders)*, 517 B.R. 245,

(continued...)

not abuse is discretion in ordering that the sanctions award could be paid from the amount that Lane will receive if there are surplus funds.

**C.  The bankruptcy court did not abuse its discretion in imposing sanctions in spite of Lane's contention the Trustee's motion was filed for an improper purpose.**

Lane contends that the bankruptcy court erred in imposing sanctions because he claims the evidence showed that the Trustee's efforts to sanction him were part of a "campaign of harassment."[36] The Trustee counters that the bankruptcy court considered Lane's arguments and testimony presented at the Sanctions Hearing, and rejected those arguments when it awarded sanctions. We agree. The record supports a finding that the Trustee sought sanctions due to Lane's well-documented history of interference with the Trustee's sale of estate assets and administration of the estate, much of which is in direct breach of the commitment he made in the Settlement Agreement to not interfere with the sale of estate assets.

In addition, Lane had leveled much the same accusations at the Trustee earlier in the case, and on November 5, 2014, after an evidentiary hearing, the court entered an order denying Lane's motion for sanctions against the Trustee.[37] The bankruptcy court at that time dismissed Lane's claim that the Trustee continued to "demonize" him. Accordingly, the bankruptcy court had already

---

[35]    (...continued)
251 (Bankr. D. Colo. 2014) *aff'd Flanders v. Lawrence (In re Flanders)*, No. CO–14–055, 2015 WL 4641697, at *1 (10th Cir. BAP Aug. 5, 2015) (noting that surplus funds from the estate distributed to the debtor, either actually or constructively, were no longer estate property and were subject to garnishment for collection of a postpetition federal criminal judgment).

[36]    Tr. at 14, *in* Appellant's App. at 665.

[37]    Order Denying Debtor's Motion for Sanctions Against Trustee Gary Barney for Making False Statements to the Court at 1, *in* Supp. App. at 351.

ruled against Lane on many, if not all of his claims, and the bankruptcy court simply did not believe that the Trustee, in bringing the sanctions motion, was proceeding with an improper purpose. The record amply supports that conclusion.

## IV. Conclusion

The bankruptcy court did not abuse its discretion in assessing $321,659 in sanctions against Lane, which amount represented the reasonable attorneys' fees incurred by the Trustee caused by Lane's improper interference in the sale of estate assets. The bankruptcy court clearly took Lane's financial situation into account when ordering the sanctions, and thus did not abuse its discretion in ordering that these sanctions be paid from any surplus distribution that may be available at conclusion of the administration of his estate. Finally, the bankruptcy court did not abuse its discretion in declining to find the Trustee's request for sanctions was brought for any improper purpose. Accordingly, the Second Sanctions Decision is affirmed.